## THE C. C. CLARKE.

### (District Court, S. D. New York. May 18, 1906.)

COLLISION—TUGS MEETING—VIOLATION OF PASSING RULES.

A tug coming out light from the Atlantic Basin and turning up the Buttermilk Channel at night, *held* solely in fault for a collision with a tug passing down with a tow on her side a little to the eastward of the middle of the channel, on evidence which, although conflicting, showed by a preponderance that on coming from the basin she had the other tug on her starboard hand on a crossing course and was bound to keep out of the way, and that after she turned up stream article 1 of the pilot rules applied and required the vessels to pass port to port in conformity to which the descending tug signaled and ported her helm. The latter *held* not in fault for not stopping and reversing; it being doubtful if the vessels were far enough apart when the danger became apparent to thus avoid the collision, and the plain faults of the other tug being sufficient to account for it.

In Admiralty. Suit for collision.

Wing, Putnan & Burlington, for libellant.

Butler, Notman & Mynderse, for claimant.

ADAMS, District Judge. This action was brought by the National Fireproofing Company, the owner of the tug Fireproofer, against the tug C. C. Clarke to recover the damages sustained in a collision between those vessels, which happened in the Buttermilk Channel, and on the 31st day of December, 1904, about 5 o'clock A. M. The tide was ebb. The Fireproofer was light and bound from the Atlantic Basin to Wallabout in the East River. The Clarke had taken in tow on her starboard side, so that it projected ahead about 10 feet, a grain barge at pier 31 East River, a short distance above the gap of the Atlantic Basin, and backed out, the sterns of the vessels swinging down the river under the influence of the tide. The Clarke then circled around under a starboard wheel until she straightened down the channel. The tugs came in collision somewhat to the westward of the middle of the channel and opposite a point about half way between the gap of the Basin and the Hamilton Avenue Ferry, the Fireproofer striking the Clarke on her port bow about 20 feet from the stem.

The Fireproofer alleges that after she passed another tug bound down, she sighted the green light of the Clarke, which was appar-

ently heading towards Hamilton Ferry; that the Clarke went across the Fireproofer's bow, blew one blast and then suddenly changed her course to the starboard, whereupon the latter gave a signal of two blasts and stopped her engines; that the Clarke then blew alarm signals, which the Fireproofer answered with alarm signals and reversed at full speed; that the Clarke swung to the starboard still further, shutting out her green light and showing only her red; that the Clarke blew alarm signals the second time and when about 100 feet from the Fireproofer blew a signal of two blasts; that although the Fireproofer had sternway, the Clarke came on and struck the Fireproofer's stem doing damage which will amount, with demurrage to upwards of $3500. The Fireproofer alleges as faults against the Clarke: (1) that she was not in charge of a competent person; (2) that she did not keep a good lookout; (3) that she did not carry the vertical lights required by law for a vessel with a tow; (4) that though she had the Fireproofer on her starboard hand, she did not keep out of her way but attempted to cross her bow; (5) that after crossing the Fireproofer's bow, she did not continue her course but ported her helm and thus brought about the collision; (6) that she did not reverse her engines but came on at full speed, and (7) that they did not give proper and timely signals.

The Clarke alleges that on the morning in question, at Union Stores, on the Brooklyn side, a short distance above the gap, she took in tow on her starboard side a partly loaded grain barge, bound for the Erie Basin, some distance beyond the Atlantic Basin; that while the tug and tow were proceeding down the Buttermilk Channel, somewhat to the starboard of mid-channel, those in charge of the navigation of the Clarke saw a tug, which later proved to be the Fireproofer, coming out of the Atlantic Basin Gap, showing her green light and bearing several points off the port bow of the Clarke; that the Fireproofer was swinging under a port helm as she came out and shortly showed both her red and green lights, then shut out the green and exhibited her red light only to the Clarke; that after the exchange of signals between the Fireproofer and a tug bound down the channel ahead of the Clarke, passing the Fireproofer port to port, and when the red light of the Fireproofer only was visible to the Clarke, the latter gave a single blast on her whistle to indicate that she would pass the Fireproofer port to port, said tug still bearing on the port bow of the Clarke; that said signal was answered with a single blast by the Fireproofer and the helm of the Clarke was ported in conformity with said agreement; that shortly afterwards, the Fireproofer gave a signal of two blasts, contrary to said agreement, and showed both her green and red side lights to the Clarke; that thereupon the Clarke slowed her engines and repeated her original signal of one whistle, to indicate she was carrying a port helm, and followed it promptly by danger blasts; that the Fireproofer answered the danger blasts but kept on with unabated speed and struck the Clarke a heavy blow on her port bow, about 20 feet from the stem; that when the vessels were in very close proximity to each other and a collision inevitable, the engines of the Clarke were put ahead a few turns and her wheel

held hard a port in order that the Fireproofer might not 'strike the grain barge. The Clarke's allegations of fault against the Fireproofer are: (1) That having agreed to pass port to port, the Fireproofer failed to abide by the agreement but on the contrary gave two blasts of her whistle and directed her course to port; (2) in that, although when the vessels originally sighted each other, the Clarke bore on the starboard hand of the Fireproofer, the latter did not keep out of the way of the Clarke; (3) in that although the Fireproofer at all times bore on the port bow of the Clarke, the former did not avoid the latter, which was the privileged vessel; (4) in that when the said vessels were in positions of safety, each showing her port light to the other, the Fireproofer changed her course and attempted to cross the bow of the Clarke; (5) in that the Fireproofer did not reverse her engines at full speed immediately upon hearing danger blasts from the Clarke; (6) in that the Fireproofer did not at all times pursue a course on her starboard side of the channel; (7) in that the Fireproofer was not in charge of competent persons, and (8) in that the Fireproofer did not have a sufficient lookout.

The testimony in substance supports the respective contentions and is in as great conflict as the pleadings, but that of the Clarke, that after getting straightened down in the channel, subsequent to making the turn from her starting place, she pursued a straight course down the channel until nearly in collision, is much more credible than the claim of the Fireproofer's witnesses that the Clarke was apparently coming across the channel, first showing her green light and then turned to the starboard, showing both of her side lights and then the red alone just before the collision. The pilot, at my instance, indicated the movements of the Clarke, as well as his own boat, on a diagram, which was marked in evidence by the Clarke (Claimant's Exhibit A). It is reasonably consistent with the Fireproofer's testimony but improbable and entirely opposed to that of the Clarke, supported as it is, to some extent, by the disinterested testimony from the Narragansett, the tug that was preceding the Clarke in the channel.

I concluded at the trial that the charge of the Fireproofer could not be sustained, and that those of the Clarke should, but reserved decision to examine into the question of the Clarke's possible participation in the faults of the collision, because instead of stopping and reversing, when it became imminent, she increased her speed.

The testimony of the Clarke shows the well known fact that where a tug with but one boat in tow alongside, the tow will ordinarily on the tug stopping her speed and reversing, turn in the direction of the tug, thus, in this case, the effect of stopping the engines would be to turn the tug and tow to the port and the effect of reversing would be to increase such a turn. Having this in view, the pilot of the Clarke, when the collision was impending, put the engines at full speed ahead, for the purpose of saving the tow which he contends would have been exposed to the blow instead of the tug, if the engines of the Clarke had been stopped and reversed. This is doubtless true but it leaves open the question whether the vessels were far or only a short dis-

tance apart when the necessity for stopping and backing became apparent. The pilot of the Clarke testified that at first, when the Fireproofer was coming out of the Gap, she blew one blast and showed her green light alone and then blew two and changed to both lights; that when she changed to both lights, she was about two lengths away and the Clarke slowed her engines. Such slowing had little effect, however, as within a few seconds, the Clarke put her engines at full speed ahead again. The situation was at first governed by the starboard hand rule requiring the Fireproofer to avoid the Clarke, and afterwards by Pilot Rule 1, requiring the vessels to pass port to port. It may be that, notwithstanding the Fireproofer's violation of both of these rules, the collision might have been avoided if the Clarke had reversed immediately upon discovering the possible danger of the situation, but it is doubtful if the vessels were then far enough apart to avoid it, and in view of such doubt and the plain faults of the Fireproofer which sufficiently account for the collision, it does not seem that the Clarke should be held responsible for any part of the damages.

Libel dismissed.